UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Essentia Health,<br><br>        Plaintiff,<br><br>v.<br><br>ACE American Insurance Company<br><br>        Defendant. | File No. _____<br><br>**COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

## COMPLAINT

For its Complaint against ACE American Insurance Company, Essentia Health states and alleges as follows:

## THE PARTIES

1. Plaintiff Essentia Health ("Essentia") is a non-profit corporation that has its principal place of business in Duluth, Minnesota. Essentia is organized under Minnesota law.

2. Upon information and belief, Defendant ACE American Insurance Company ("ACE") has its principal place of business in Pennsylvania and is a corporation organized under Pennsylvania law.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy, exclusive of interest and costs, exceeds $75,000, and there is complete diversity of citizenship between the parties.

4.      Venue over this action is proper in the District of Minnesota under 28 U.S.C. § 1391 because a substantial part of the risk insured under the insurance contract at issue is located in this District, the majority of the losses and damage for which Essentia seeks insurance coverage took place in this District, a substantial part of the property that is at issue in this action is situated in this District, and the insurance contract was issued to Essentia by ACE in this District. Upon information and belief, ACE regularly conducts its insurance business in this District.

## ACE'S INSURANCE POLICY

5.      For the policy period of April 1, 2018 to April 1, 2021, ACE sold Essentia a "Premises Pollution Liability Portfolio Insurance Policy," bearing policy number PPI *****2330 003 (the "Policy").

6.      A true and correct copy of the Policy is attached as **Exhibit A**.

7.      Essentia has paid all of the required premiums for the Policy.

8.      Essentia is the "First Named Insured" insured under the Policy.

9.      The "Per Pollution Condition or Indoor Environmental Condition Limit of Liability" under the Policy is $5,000,000.

10.     The "Total Policy and Program Aggregate Limit of Liability for All Pollution Conditions and Indoor Environmental Conditions" under the Policy is $8,000,000.

11.     Under the Policy, the "Self-Insured Retention / Deductible Period" is $25,000 "Per Pollution Condition or Indoor Environmental Condition" and 5 "Days Per Pollution Condition or Indoor Environmental Condition."

12. Insuring Agreement A of the Policy is entitled "FIRST-PARTY REMEDIATION COSTS COVERAGE (Coverage **A.**)"

13. Under Insuring Agreement A of the Policy, ACE promised to "pay on behalf of the 'insured' for 'loss', in excess of the 'self-insured retention' or deductible period (as applicable) resulting from":

> "First-party claims" arising out of: **1)** a "pollution condition" on, at, under or migrating from a "covered location" . . . provided the "insured" first discovers such "pollution condition" . . . during the "policy period." Any such "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period."

> The coverage afforded pursuant to this Coverage **A.** only applies to "pollution conditions" . . . that first commence, in their entirety, on or after the retroactive date identified in Item 5. of the Declarations [April 1, 2012], if applicable, and prior to the expiration of the "policy period."

14. Under the Policy, the term "First-party claim" means "the first-party discovery of a 'pollution condition' . . . during the policy period."

15. Under the Policy, the term "pollution condition" is defined to mean and include:

> The discharge, dispersal, release, escape, migration, or seepage of <u>any</u> solid, liquid, gaseous or thermal <u>irritant</u>, <u>contaminant</u>, or <u>pollutant</u>, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste," "mixed waste" and medical, red bag, <u>infectious or pathological wastes,</u> on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

(Emphasis added.)

3

16. With respect to "pollution conditions" at a "covered location," "Loss" under the Policy is defined to include "business interruption loss," which is defined, in turn, to include: "1. 'Business income'; 2. 'Extra expense'; and 3. 'Delay expense.'"

17. Under the Policy, a "covered location" includes "[a]ny location owned, operated, managed, leased or maintained by [Essentia Health] . . . ."

18. The locations listed on Endorsement 8 to the Policy, titled "Schedule of Covered Locations," are additional "covered locations" under the Policy.

## CORONAVIRUS AND COVID-19

19. COVID-19 is a communicable disease caused by a virulent strain of coronavirus called SARS-CoV2 (hereinafter "the coronavirus").

20. COVID-19 leads to sickness, injury, and death.

21. According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 often spreads from person to person, through respiratory droplets produced when an infected person coughs, sneezes, or talks, with spread being more likely when people are in close contact with one another.

22. The CDC has also issued guidance recognizing the coronavirus can be spread through aerosols, which can linger in the air for minutes to hours and travel farther than six feet.[1] This kind of spread is referred to as airborne transmission.

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed on January 19, 2021).

4

23. The World Health Organization ("WHO") has confirmed that the coronavirus that causes COVID-19 can and does exist on objects or surfaces. According to a study documented in *The New England Journal of Medicine*, the coronavirus was detectable for up to three hours in aerosols, up to four hours on copper, up to twenty-four hours on cardboard, and up to three days on plastic and stainless steel.[2] Indeed, the coronavirus was detected on a cruise ship 17 days after the ship had been evacuated as a result of the spread of COVID-19 on the ship.[3]

24. On March 11, 2020, COVID-19 was declared a pandemic by the World Health Organization.

25. Thereafter, state and local government authorities began to issue quarantine and suspension orders across the country requiring residents to shelter in place or remain in their homes unless performing "essential" activities (hereinafter "Shut Down Orders").

26. As of November 9, 2020, the coronavirus has resulted in over 10 million confirmed COVID-19 cases in the United States and caused more than 237,000 deaths.

---

[2] *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last accessed on January 19, 2021); *see also* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last accessed on January 19, 2021).

[3] *See* Leah F. Moriarty, et al., Morbidity and Mortality Weekly Report, March 27, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w ("SARS-CoV-2 RNA was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess…") (last accessed on January 19, 2021).

## THE SUSPENSIONS OF ESSENTIA'S OPERATIONS DIRECTLY ATTRIBUTABLE TO THE CORONAVIRUS AND COVID-19

27. Essentia is an integrated healthcare system based in Duluth, Minnesota with facilities in Minnesota, Wisconsin, and North Dakota.

28. Essentia operates 14 hospitals, 70 clinics, 6 long-term care facilities, 3 assisted living facilities, 3 independent living facilities, 5 ambulance services and 1 research institute, with 13,500 employees, including more than 2,000 physicians and credentialed practitioners.

29. The coronavirus and COVID-19 has caused tremendous disruption and business interruption loss at Essentia's various hospitals, clinics and facilities.

30. The partial or complete suspension of Essentia's operations at Essentia's "covered locations" under the Policy has been directly attributable to the coronavirus, COVID-19, and the Shut Down Order issued by governmental authorities, including Minnesota Governor Tim Walz.

31. On March 19, 2020, Governor Walz issued Emergency Executive Order 20-09, which required the indefinite postponement of all non-essential or elective surgeries and procedures that utilize PPE or ventilators. A copy of Order 20-09 is attached as **Exhibit B**.

32. Order 20-09 includes the following statements:

- On March 17, 2020, the Centers for Disease Control and Prevention recommended delaying elective inpatient and outpatient surgeries and procedures, which include dental procedures.

- On March 18, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued similar guidance. CMS recognizes that conservation of

6

> critical resources such as ventilators and personal protective equipment ("PPE") is essential to aggressively address the COVID-19 pandemic.
>
> - CMS has also recognized that non-emergent or elective procedures increase patient and provider contact, which could increase the risk of COVID-19 transmission.
>
> - This risk provides further reason to delay elective surgeries and procedures. To ensure the health and safety of Minnesotans, it is important to establish consistency throughout our healthcare system and ensure that our resources can be focused on responding to this pandemic.

33. On May 5, 2020, Governor Walz issued Emergency Executive Order 20-51. A copy of Order 20-51 is attached as **Exhibit C**.

34. Order 20-51 states:

> Although postponement of non-essential or elective procedures has proven to be an effective means of preserving essential healthcare resources for the COVID-19 response, Minnesota Department of Health ("MDH") guidance released along with this Executive Order also recognizes that extended delays in the provision of certain care may pose substantial risks to patients. Non-essential or elective procedures are often clinically necessary, for example, to treat chronic pain and conditions or to prevent, cure, or slow the progression of diseases.

35. Accordingly, Order 20-51 rescinded Order 20-09 in order "to allow hospitals, ambulatory surgical centers, and clinics (collectively, 'facilities' or 'healthcare facilities')—whether veterinary, medical, or dental—to resume the provision of many currently delayed procedures once facilities have adequately planned to prioritize the ongoing COVID-19 response; develop criteria for determining which procedures should proceed during the COVID-19 pandemic; and provide a safe environment for facility staff, patients, and visitors."

36. Under Order 20-51, Governor Walz put in place new directives, requiring facilities like Essentia to develop and implement a detailed written plan "establishing criteria for determining whether a procedure should proceed during the COVID-19 pandemic, for prioritizing procedures, and for ensuring a safe environment for staff, patients, and visitors."

37. As a result of the coronavirus, COVID-19 and the Shut-Down Orders, including but not limited to Governor Walz's Emergency Executive Orders 20-09 and 20-51, Essentia's Minnesota operations at all of its locations were partially or completely suspended. Some of the suspended operations and procedures that have led to Essentia's losses have included postponement of elective surgical procedures, mammograms, colonoscopies, and regular physical exams and doctor visits.

38. As a result of the coronavirus and COVID-19, for just one month, in April 2020, Essentia suffered losses across its 15 care facilities[4] totaling an estimated $59,535,178.86.

39. In the month of April 2020, a total of 24 hospitalized patients and 5 employees tested positive for COVID-19 at Essentia's Minnesota facilities..

---

[4] These facilities, which are "covered location[s]" under the Policy, include: Essentia Health Duluth; Essentia Health St. Mary's Medical Center; The Duluth Clinic, Ltd.; Essentia Health Sandstone; Essentia Health St. Mary's-Superior; Essentia Health Northern Pines; Essentia Health Polinsky Medical Rehabilitation Center; Essentia Health Deer River; Essential Health Virginia; Essentia Health Ada; Essentia Health Fosston; Essentia Health Holy Trinity Hospital; Essentia Health St. Mary's-Detroit Lakes; Essentia Health St. Joseph's Medical Center; and Essentia Health Brainerd Specialty Clinic.

40. Upon information and belief, commencing within the Policy's policy period and from March 19, 2020 forward, coronavirus and COVID-19 have been present on or at all of Essentia's covered locations including the Essentia locations specifically identified herein.

41. Essentia has specifically confirmed the presence of COVID-19 at Essentia's Duluth, Minnesota location at 407 East 3rd Street, Duluth, MN 55805 (the "Duluth Hospital"), which is a "covered location" under the Policy. In addition to 865 patients at the Duluth Hospital testing positive for COVID-19 as of December 31, 2020, as of January 12, 2021, an estimated 504 Essentia employees at the Duluth Hospital have also tested positive for COVID-19.

42. At Essentia's other Minnesota locations, 589 patients and 429 employees have tested positive for COVID-19 as of December 31, 2020 and January 12, 2021 respectively.

## ACE'S DENIAL OF COVERAGE

43. Essentia provided notice to ACE of its claim for business interruption losses resulting from the coronavirus and COVID-19 on March 31, 2020.

44. ACE denied coverage on May 8, 2020.

45. ACE's denial of coverage is wrongful. The terms and conditions of the Policy are satisfied and have been met.

46. The exclusions of the Policy do not apply to Essentia's claim for insurance coverage for business interruption losses as a result of suspensions of Essentia's operations directly attributable to the coronavirus and COVID-19.

47. Contrary to ACE's position, the coronavirus and COVID-19 constitute a "pollution condition" as defined under the Policy.

48. ACE defined the term "pollution condition" in its Policy to include "[t]he discharge, dispersal, release, escape, migration, or seepage of <u>any</u> solid, liquid, gaseous or thermal <u>irritant</u>, <u>contaminant</u>, or <u>pollutant</u>, including . . . <u>infectious or pathological wastes</u> . . . ." (Emphasis added.)

49. The plain meaning of the word "irritant" is "anything that irritates" or "a biological, chemical, or physical agent that stimulates a characteristic function or elicits a response, especially an inflammatory response."[5]

50. Similarly, the plain meaning of "contaminant" is "something that contaminates" and "contaminate" means "to make impure or unsuitable by contact or mixture with something unclean, bad, etc."[6]

51. "Pollutant" means "any substance, as certain chemicals or waste products, that renders the air, soil, water, or other natural resource harmful or unsuitable for a specific purpose."[7]

52. ACE has previously acknowledged to courts and regulators that a "virus" constitutes a contaminant and/or pollutant.

---

[5] See https://www.dictionary.com/browse/irritant?s=t (last accessed on January 19, 2021).

[6] See https://www.dictionary.com/browse/contaminate?s=t (last accessed on January 19, 2021).

[7] See https://www.dictionary.com/browse/pollutant?s=t (last accessed on January 19, 2021).

10

53. In *Rembrandt Enterprises, Inc. v. Illinois Union Insurance Company*, ACE conceded that the avian flu virus was a "pollution condition," which was defined using the same or substantially similar coverage terms in Essentia's Policy here. No. 15-2913, ECF No. 210 (D. Minn.) ("Nor does it dispute that Rembrandt's farms were impacted by a 'pollution condition.'").

54. In regulatory filings with the Wisconsin Office of the Commissioner of Insurance, ACE described the meaning of contamination and the term "contaminant" in its pollution exclusions, which first arose in general liability policies in around 1986 and which was also the genesis of ACE's "pollution condition" coverage.

55. ACE's regulatory filing memorandum submitted to the Wisconsin Office of the Commissioner of Insurance on or about March 2, 2007 (Filing Number 07-CML-059) states, in relevant part:

> The current pollution exclusion in property policies encompasses contamination (in fact, uses the term *contaminant* in addition to other terminology). Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time. . . .
>
> Some other examples of viral and bacterial contaminants are rotavirus, SARS, influenza (such as avian flu) . . . . The universe of disease-causing organisms is always in evolution.
>
> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. . . .
>
> In light of these concerns, we are introducing a new mandatory endorsement relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.

(Emphasis added.)

56. In other ACE insurance polices involving similar risks, ACE expressly defines the terms "pollutant" or "contaminant" as including a "virus." *See PBM Nutritionals, LLC v. Lexington Insurance Company*, 283 Va. 624, 630 (Va. 2012) (defining "POLLUTANTS OR CONTAMINANTS" to include a "virus"); *see also First Specialty Ins. Co. v. GRS Management Associates, Inc.*, 08-81356, 2009 WL 2524613 *5 (S.D. Fla. Aug. 17, 2009) (holding that viral substance in swimming pool was a "viral contaminant" under the terms of pollution exclusion).

57. Upon information and belief, ACE's public representations, including advertising and promotional communications and materials, have characterized contaminants to include viruses.

58. Upon information and belief, in ACE's renewals of its Premises Pollution Liability Portfolio Policies, ACE is proposing and insisting on the addition of a "COMMUNICABLE, INFECTIOUS OR CONTAGIOUS DISEASES EXCLUSIONARY ENDORSEMENT," which states:

> **Communicable, Infectious or Contagious Diseases**
>
> "Loss" arising out of or related to any communicable, infectious or contagious disease, including but not limited to, any disease caused by, in whole or in part, bacteria, viruses, microorganisms, pathogens or prions (hereinafter Microbial Matter), whether deemed living or not.
>
> This exclusion applies regardless of the means of transmission of such Microbial Matter, whether direct or indirect, including, but not limited to, airborne transmission, bodily fluid or discharge transmission, or transmission form or to any surface,

object, solid, liquid or gas, or between or among humans and other organisms.

This exclusion shall not apply to any such exclusively caused by *legionella pneumophilia*.

59. ACE's actions in seeking to add this virus exclusion into its renewal policies is a reflection of the lack of clarity and ambiguity in the Policy as to whether a virus like the coronavirus constitutes a "pollution condition."

60. Upon information and belief, discovery is likely to reveal other evidence that the term "pollution condition" as defined in the Policy includes viruses within its scope.

61. Essentia has been damaged as a result of ACE's denial of coverage under the Policy as set forth herein.

62. Essentia has disputed ACE's denial of coverage, and there is a justiciable controversy between Essentia and ACE with respect to whether Essentia's business interruption losses as a result of suspensions of Essentia's operations directly attributable to the coronavirus and COVID-19 are covered under the Policy.

## COUNT ONE
### (Breach of Contract)

63. Essentia incorporates and reasserts herein all of the foregoing paragraphs.

64. The Policy is a valid and enforceable contract of insurance between Essentia and ACE.

65. Pursuant to the terms and conditions of the Policy, Essentia is entitled to coverage for "business interruption loss" suffered as a result of suspensions of Essentia's

operations directly attributable to the coronavirus and COVID-19, which constitute a "pollution condition" as defined by ACE under the Policy.

66. ACE has denied coverage for Essentia's business-interruption losses as described herein and thereby breached the Parties' insurance contract.

67. As a result of ACE's breach of contract, Essentia has suffered damages far in excess of the Policy's limits, exclusive of interest and costs.

## COUNT TWO
### (Declaratory Judgment)

68. Essentia incorporates and reasserts herein all of the foregoing paragraphs.

69. The Policy is a valid and enforceable contract of insurance between Essentia and ACE.

70. Pursuant to the terms and conditions of the Policy, Essentia contends it is entitled to coverage for "business interruption loss" suffered as a result of suspensions of Essentia's operations directly attributable to the coronavirus and COVID-19, which constitute a "pollution condition" as defined by ACE under the Policy.

71. ACE has denied coverage for Essentia's coronavirus-related business-interruption losses under the Policy.

72. Under 28 U.S.C. §§2201, *et seq.*, an actual, justiciable controversy exists between the parties, with Essentia seeking a declaration that it is entitled to up to $5,000,000 in coverage for "business interruption" loss under the Policy.

73. Essentia is entitled to a declaration of ACE's obligations and duties to provide coverage under the Policy for Essentia's business-interruption losses as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Essentia requests judgment and declaratory relief in its favor and against ACE, providing Essentia with the following:

    a.    An award of compensatory damages resulting from ACE's breach of its Policy;

    b.    All damages allowed by law, including all consequential damages flowing from ACE's breach of the Policy;

    c.    A declaration of Essentia's rights and ACE's duties under the Policy in connection with Essentia's coronavirus-related business-interruption losses;

    d.    All interest on the above-described amounts allowed by law, including prejudgment interest;

    e.    All attorneys' fees, costs, and expenses allowed by law; and

    f.    Such other and further relief as the Court deems necessary, just, or proper.

## DEMAND FOR JURY TRIAL

Essentia demands a trial by jury on all issues so triable.

Dated: January 28, 2021

Respectfully submitted,

By: /s/ *signature*

**MASLON LLP**
Rikke Dierssen-Morice (#0237826)
Bryan R. Freeman (#3087154)
Judah A. Druck (#0397764)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 672-8200
rikke.morice@maslon.com
bryan.freeman@maslon.com
judah.druck@maslon.com

**ATTORNEYS FOR ESSENTIA HEALTH**

16