UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Essentia Health, | File No. 21-cv-207 (ECT/LIB) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| ACE American Insurance Company, | |
| Defendant. | |

Rikke A. Dierssen-Morice, Judah Druck, and Bryan R. Freeman, Maslon LLP, Minneapolis, MN, for Plaintiff Essentia Health.

Kevin M. Haas, Clyde & Co. US LLP, Florham Park, NJ; Alexandra L. Zabinski, Cheryl A. Hood Langel, and Robert L. McCollum, McCollum Crowley Moschet Miller & Laak, Ltd., Minneapolis, MN, for Defendant ACE American Insurance Company.

At the beginning of the COVID-19 pandemic, Minnesota Governor Tim Walz issued an executive order requiring health-care providers to suspend elective medical procedures at their facilities. That suspension caused Plaintiff Essentia Health to lose a substantial amount of revenue. After unsuccessfully trying to recover some of those losses from its insurer, ACE American Insurance Company, Essentia filed this lawsuit, alleging that COVID-19 is a "pollution condition" that had caused it to suffer covered business interruption loss. ACE has moved to dismiss the Complaint for failure to state a claim.

ACE's motion will be granted. The term "pollution condition," when read in conjunction with other provisions of the policy in this case, cannot reasonably be understood to include a virus. Because Essentia has only sought coverage on the ground

that COVID-19 is a "pollution condition," this conclusion dooms its claim as a matter of law.  The Complaint will therefore be dismissed with prejudice.

I[1]

COVID-19 is a "communicable disease caused by a virulent strain of coronavirus called SARS-CoV2[.]"  Compl. ¶ 19 [ECF No. 1].  The virus "often spreads from person to person, through respiratory droplets produced when an infected person coughs, sneezes, or talks," and transmission is accordingly "more likely when people are in close contact with one another."  *Id.* ¶ 21.  But it can also spread via "airborne transmission," which involves "aerosols" that "can linger in the air for minutes to hours[.]"  *Id.* ¶ 22.  The virus has caused millions of confirmed COVID-19 cases and hundreds of thousands of deaths in the United States.  *Id.* ¶ 26; *see id.* ¶ 20.

Government officials have taken significant steps to combat the spread of the virus.  *See id.* ¶¶ 24–25.  Relevant to this case, Minnesota Governor Tim Walz issued an executive order on March 19, 2020, that "required the indefinite postponement of all non-essential or elective surgeries and procedures that utilize [personal protective equipment] or ventilators."  *Id.* ¶¶ 31–32; *see id.*, Ex. B [ECF No. 1-2].  That order was in effect until May 5, 2020, when a new executive order lifted the moratorium on elective procedures but required health-care facilities to "establish[] criteria for determining whether a procedure should proceed during the COVID-19 pandemic, for prioritizing procedures, and for

---

[1]     In accordance with the standards governing a motion under Rule 12(b)(6), the facts are drawn entirely from the Complaint and documents necessarily embraced by it.  *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

ensuring a safe environment for staff, patients, and visitors." *Id.* ¶ 36; *see id.*, Ex. C [ECF No. 1-3].

COVID-19 and the resulting elective-procedure restriction have had a major impact on Essentia, "an integrated healthcare system" that operates hospitals, clinics, and other health-care facilities in Minnesota and elsewhere. *Id.* ¶¶ 27–29. Numerous patients and Essentia employees have tested positive for the virus, and Essentia believes that the virus has been present at all of its locations since March 2020. *Id.* ¶¶ 39–42. In April 2020, while the elective-procedure moratorium was in effect, "Essentia's Minnesota operations at all of its locations were partially or completely suspended." *Id.* ¶ 37. The company estimates that, just that month, it lost more than $59 million as a result of these disruptions. *Id.* ¶ 38.

To recover some of this lost revenue, Essentia sought coverage under a "Premises Pollution Liability Portfolio Insurance Policy" ("the Policy") issued by ACE. *Id.* ¶ 43; *see id.*, Ex. A [ECF No. 1-1]. Relevant here, under an insuring agreement entitled "First-Party Remediation Costs Coverage," the Policy covers "'loss'. . . resulting from: . . . 'First-party claims' arising out of . . . 1) a 'pollution condition' on, at, under or migrating from a 'covered location'; [or] 2) an 'indoor environmental condition' at a 'covered location[.]'" Policy at 5.

This insuring agreement contains two key categories of terms with cascading definitions that must be carefully picked apart.[2] The first category is the type of loss

---

[2] There is no dispute that Essentia's locations are "covered location[s]" and that COVID-19 gave rise to a "[f]irst-party claim," so no more will be said about those terms.

3

covered. "[L]oss" in this context includes both "[f]irst-party remediation costs," which Essentia does not seek, and "business interruption loss," which it does. *Id.* at 11. "First-party remediation costs" are, essentially, expenses that an insured incurs to "investigate" and remedy "indoor environmental conditions" and "pollution conditions." *Id.* at 10, 13. "Business interruption loss" means, as relevant here, "[b]usiness income."[3] *Id.* at 8. "[B]usiness income" in turn includes "[n]et profit or loss, before income taxes, . . . that would have been realized had there been no 'business interruption.'" *Id.* And a "[b]usiness interruption" is "the necessary partial or complete suspension of the 'insured's' operations at a 'covered location' for a period of time, which is directly attributable to a 'pollution condition' or 'indoor environmental condition[.]'" *Id.* The covered period of business interruption "extend[s] from the date that the operations are necessarily suspended and end[s] when such 'pollution condition' or 'indoor environmental condition' has been remediated to the point at which the 'insured's' normal operations could reasonably be restored." *Id.*

The second category consists of the covered causes of loss. The Policy defines "pollution condition" as

> [t]he discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or

---

[3] "Business interruption loss" also includes "[e]xtra expense" and "[d]elay expense," but no Party argues that either of these kinds of loss is relevant here. Policy at 8.

4

> pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

*Id.* at 12–13.[4] Through a "Healthcare Amendatory Endorsement," the Policy defines "indoor environmental condition" to include "the discharge, dispersal, release, escape, migration or seepage of bacteria . . . or viruses in a building or structure, or the ambient air within such building or structure," but only if, among other things, the insured seeks "remediation costs" and the bacteria or viruses involved "are not the result of communicability through human-to-human or bodily fluid contact." *Id.* at 29.

Essentia alleges that COVID-19 is a "pollution condition" under the Policy and that it suffered covered "business interruption loss" during the moratorium on elective procedures. Compl. ¶¶ 46–47. To support this conclusion, it argues that the Sars-CoV2 virus is an "irritant" or a "contaminant" that fits within the plain meaning of the Policy's definition of "pollution condition." *Id.* ¶¶ 48–51. It also alleges that "ACE has previously acknowledged to courts and regulators that a 'virus' constitutes a contaminant and/or pollutant." *Id.* ¶¶ 52–57.

Essentia gave ACE notice of its claim on March 31, 2020, and ACE denied coverage that May. *Id.* ¶¶ 43–44. In January 2021, Essentia filed this lawsuit, asserting a claim for breach of contract. *Id.* ¶¶ 63–67. Essentia seeks a judgment declaring "that it is entitled to up to $5,000,000 in coverage for 'business interruption' loss under the Policy" as well as

---

[4] The Policy does not define the words "irritant," "contaminant," or "pollutant."

compensatory and consequential damages, interest, attorneys' fees, and costs.[5] *Id.* ¶¶ 68–73 and at 15 ("Prayer for Relief"). ACE has moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. ECF No. 14; *see* Fed. R. Civ. P. 12(b)(6).

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792. Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

III

In its motion to dismiss, ACE primarily argues that COVID-19 is not a "pollution condition" under the Policy. It asserts that another court in this District already resolved this question in *Seifert v. IMT Ins. Co.*, 495 F. Supp. 3d 747 (D. Minn. 2020); that the definition of "pollution condition" is limited to forms of "traditional environmental pollution"; and that the definition does not include viruses because an endorsement in the

---

[5] The Policy limits ACE's liability, subject to a deductible, to $5,000,000 per "pollution condition" or "indoor environmental condition" and $8,000,000 in the aggregate for all such conditions. Policy at 2.

Policy provides a more limited form of virus coverage. Def.'s Mem in Supp. at 8–17 [ECF No. 16]; Def.'s Reply Mem. at 2–12 [ECF No. 26]. Essentia responds that *Seifert* does not apply; that COVID-19 falls within the plain-language definition of "pollution condition" because it is a "contaminant" or an "irritant"; that Minnesota law does not limit these terms to the context of "traditional environmental pollution"; and that using an endorsement to limit the meaning of "pollution condition" would create an impermissible "hidden exclusion." Pl.'s Mem. in Opp'n at 9–29 [ECF No. 24].[6]

Addressing these arguments requires interpretation of the Policy, and the Parties agree that Minnesota law governs that interpretive exercise. *See* Def.'s Mem. in Supp. at 6; Pl.'s Mem. in Opp'n at 8–9. Minnesota's "[g]eneral principles of contract interpretation apply to insurance policies." *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008) (citation omitted). "Interpretation of an insurance policy and application of the policy to the facts in a case are questions of law[.]" *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001). Unambiguous terms are given their "plain and ordinary meaning," while ambiguous language is construed liberally in favor of coverage. *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). Minnesota courts apply this canon even in disputes, like this one, "involving a sophisticated insured with equal bargaining power." *Econ. Premier Assurance Co. v. W. Nat'l Mut. Ins. Co.*, 839 N.W.2d 749, 755 (Minn. Ct. App. 2013); *see also* 35A Am. Jur. 2d, Jill Gustafson,

---

[6] ACE further argues that COVID-19 cannot be a "pollutant" or a form of "infectious or pathological waste[]." Def.'s Mem. in Supp. at 9, 12–13. Essentia does not concede these issues, but it chooses not to address them for purposes of opposing ACE's motion. *See* Pl.'s Mem. in Opp'n at 10 n.4.

*Fidelity Bonds & Insurance* § 5 (May 2021 Update). Undefined policy terms are ambiguous when they "are reasonably susceptible to more than one interpretation." *Gen. Cas. Co. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009); *Carlson*, 749 N.W.2d at 45–46. "In deciding whether an ambiguity truly exists, however, a policy must be read as a whole." *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.*, 796 F.3d 962, 969 (8th Cir. 2015) (quoting *Mut. Serv. Cas. Ins. Co. v. Wilson Twp.*, 603 N.W.2d 151, 153 (Minn. Ct. App. 1999)).

Before addressing the Parties' arguments, it is helpful to get an important piece of context on the table. Many commercial property and liability insurance policies contain an exclusion for losses caused by pollution. *See, e.g.*, *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 631–32 (Minn. 2013); *see also* 11 Steven Plitt et al., *Couch on Insurance* § 155:89 (3d ed. Dec. 2020 Update); 22 Britton D. Weimer et al., *Minnesota Practice Series – Insurance Law and Practice* § 5:9 (Dec. 2020 Update) (summarizing the historical development of pollution exclusions). "Pollution legal liability policies and environmental insurance policies"—like the Policy in this case—"were designed to fill gaps in insurance coverage created by" pollution exclusions. *Pennzoil-Quaker State Co. v. Am. Int'l Specialty Lines Ins. Co.*, 653 F. Supp. 2d 690, 703 n.3 (S.D. Tex. 2009). The definitions used in pollution exclusions are frequently similar to those used in affirmative grants of pollution coverage. *Compare, e.g.*, *Midwest Family Mut. Ins. Co.*, 831 N.W.2d at 631–32, *with* Compl., Ex. A at 12–13. Because there is comparatively little precedent concerning pollution liability policies, it often makes sense to look for guidance in cases interpreting pollution exclusions. But that comparison can only go so far because courts

apply different rules when interpreting exclusions and affirmative grants of coverage. *See* 11 Steven Plitt et al., *Couch on Insurance* § 155:81 (3d ed. Dec. 2020 Update). Grants of coverage are construed liberally, and the policyholder has the burden to show that coverage exists. *Wozniak Travel*, 762 N.W.2d at 575; *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013). By contrast, courts construe exclusions narrowly, and the insurer has the burden to show that an exclusion precludes coverage. *Thommes v. Milwaukee Mut. Ins. Co.*, 622 N.W.2d 155, 158 (Minn. Ct. App. 2001).

This context partially explains why *Seifert*—the District of Minnesota case that ACE cites—has little bearing on the meaning of "pollution condition" in the Policy. In *Seifert*, the owner of a hair salon sought business interruption coverage after state-mandated COVID-19 shutdowns caused him to "suspend all business operations." 495 F. Supp. 3d at 749. The court granted the insurer's motion to dismiss based on two separate and independent conclusions: (1) the plaintiff had not alleged that COVID-19 constituted "direct physical loss," as required under the policy at issue, and (2) an exclusion for "loss or damage caused indirectly or directly by any virus, bacterium, or other microorganism" precluded coverage. *Id*. at 751–53 (internal quotation marks and citation omitted). In a footnote, the court also stated that, in view of the principle that "exclusions are to be construed narrowly and strictly against the insurer," it would not apply the policy's pollution exclusion because the coronavirus was not "in the same category of pollutants as smoke, vapor, soot, fumes, alkalis, chemicals, and waste." *Id.* at 752 n.6 (internal quotation marks and citation omitted). Setting aside the fact that this footnote did not affect the outcome of the case, it would be inappropriate to treat the *Seifert* court's statement about

the scope of a pollution exclusion as the last word on the scope of affirmative pollution coverage in a different policy. It is therefore not a reason, in itself, to grant ACE's motion.

The next question is whether the coronavirus fits within the plain-meaning definition of "pollution condition," which, again, includes "the discharge, dispersal, release, escape, migration, or seepage of *any* solid, liquid, gaseous or thermal *irritant*, *contaminant*, or pollutant[.]" Policy at 12–13 (emphasis added). Because the Policy does not define the words "contaminant" and "irritant," the dictionary is the next best place to look. *See Russell v. Sentinel Ins. Co.*, 906 N.W.2d 543, 546 (Minn. Ct. App. 2018) (explaining that Minnesota courts "may rely on dictionary definitions in determining the ordinary meaning of insurance-policy terms"). "'Contaminant' means 'one that contaminates' and 'contaminate' means 'to make impure or unclean by contact or mixture.'" *Brouse v. Nationwide Agribusiness Ins. Co.*, No. A14-1729, 2015 WL 4507996, at *4 (Minn. Ct. App. July 27, 2015) (quoting *The American Heritage Dictionary of the English Language* 406 (3d ed. 1992)). "An irritant is defined as 'something that irritates,' that is, that 'produce[s] irritation." *Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co.*, 847 F.3d 594, 599 (8th Cir. 2017) (applying North Dakota law and quoting *Webster's Third New International Dictionary* 1197 (2002)). ACE does not seem to dispute that these terms, considered in isolation, could plausibly encompass the coronavirus that causes COVID-19. The virus spreads from person to person through "respiratory droplets" and "aerosols" and causes "sickness, injury, and death" in the recipient. Compl. ¶¶ 20–22. These attributes at least arguably make the virus a "solid, liquid, gaseous or thermal" thing that "produces irritation," especially given the Policy's use of the expansive

word "any." *Cf. Larson v. Composting Concepts, Inc.*, Nos. A07-976, A07-977, A07-979, 2008 WL 2020489, at *3–4 (Minn. Ct. App. 2008) (holding that "living organisms, mold, bacteria, and bioaerosols" fell within the plain meaning of a pollution exclusion's definition of "pollutant").

Essentia argues that the analysis should end there. But that approach wouldn't be consistent with Minnesota's rules of policy interpretation. Rather than interpreting policy terms "in a vacuum," a court must read the policy "as a whole," considering the language "within its context, and with common sense." *Ritrama, Inc.*, 796 F.3d at 969–70 (citation omitted). And, where possible, a court must construe a policy "so as to give effect to all provisions." *King's Cove Marina, LLC v. Lambert Com. Constr. LLC*, 958 N.W.2d 310, 316 (Minn. 2021) (citation omitted). To that end, ACE identifies at least two other features of the Policy's language that merit attention.

First, ACE points out that the Policy identifies examples of covered "irritants," "contaminants," and "pollutants." Those examples "includ[e] soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, 'low-level radioactive waste', 'mixed waste', and medical, red bag, infectious or pathological wastes[.]" Policy at 12–13. Appearing to invoke the canon known as *noscitur a sociis*—*i.e.*, that "general words are regarded as limited in their meaning by [surrounding] words of particular character," 2 Steven Plitt et al., *Couch on Insurance* § 22:2 (3d ed. Dec. 2020 Update)—ACE argues that a "pollution condition" is limited to pollutants, contaminants, and irritants associated with "traditional environmental pollution," and that a virus does not fall within that

category. Def.'s Mem. in Supp. at 10–12; *see London Bridge Resort LLC v. Ill. Union Ins. Co.*, __ F. Supp. 3d __, No. CV-20-08109-PCT-GMS, 2020 WL 7123024, at *3–4 (D. Ariz. Dec. 4, 2020) (interpreting a pollution liability policy in this way). Whatever merit this argument might have on a blank slate, Minnesota courts have rejected it, at least in the context of similarly worded pollution exclusions. "Unlike the majority of jurisdictions, Minnesota courts do not interpret pollution exclusions according to environmental terms of art, which limits them to the traditional view of pollution to the environment[.]" *Cont'l Cas. Co. v. Advance Terrazzo & Tile Co.*, No. 03-cv-5446 (MJD/JSM), 2005 WL 1923661, at *2–4 (D. Minn. Aug. 11, 2005), *aff'd*, 462 F.3d 1002 (8th Cir. 2006); *see Wolters*, 831 N.W.2d at 631–32; *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777, 779–80 (Minn. 1999); *Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of N. Am.*, 517 N.W.2d 888, 892 (Minn. 1994); *Brouse*, 2015 WL 4507996, at *2. Given the principle that grants of coverage are construed broadly and exclusions are construed narrowly, it would make little sense to apply the "traditional environmental pollution" limitation to a term appearing in the Policy's grant of coverage when Minnesota courts have not done so when a similar term appears in pollution exclusions. It may be reasonable, then, to understand the definition of "pollution condition"—in isolation—to encompass viruses. *See Larson*, 2008 WL 2020489, at *3–4.

This understanding becomes unreasonable when the Policy's Healthcare Amendatory Endorsement enters the picture. *See* Def.'s Mem. in Supp. at 9–10. Recall that the Policy covers "loss" resulting from a "pollution condition" or an "indoor environmental condition." Policy at 5. "Loss" includes "business interruption loss"—the

12

kind of loss that Essentia seeks here—but it also includes, among other things, "[f]irst-party remediation costs." Policy at 11. So, generally, a policyholder may recover both of these categories of loss, regardless of whether the loss resulted from a "pollution condition" or an "indoor environmental condition." The Healthcare Amendatory Endorsement alters the Policy's definition of "indoor environmental condition." Importantly, it says that an "indoor environmental condition" includes "the discharge, dispersal, release, escape, migration or seepage of bacteria . . . or *viruses* in a building or structure, or the ambient air within such building or structure," but "[s]olely with respect to coverage for: a) 'claims' seeking 'remediation costs'; and b) 'first party remediation costs[.]'" Policy at 29 (emphasis added). In other words, under the Endorsement, a policyholder may recover "remediation costs" resulting from "indoor environmental conditions" that are "viruses," but it may not recover "business interruption loss" resulting from "indoor environmental conditions" that are "viruses." *See id.*

The Endorsement informs the interpretation of the term "pollution condition" because of two canons of policy interpretation. The first is known as *expressio unius est exclusio alterius*: "the expression of specific things in a contract implies the exclusion of all not expressed." *Maher v. All Nation Ins. Co.*, 340 N.W.2d 675, 680 (Minn. Ct. App. 1983); *accord Pearce v. Gen. Am. Life Ins. Co.*, 637 F.2d 536, 543 (8th Cir. 1980) (applying Missouri law). Applying this canon, the specific inclusion of "viruses" in the Endorsement's definition of "indoor environmental condition" suggests an intent not to include "viruses" in the Policy's definition of "pollution condition." The second is the principle that a court must interpret a policy to give effect to all of its provisions. *See*

13

*King's Cove Marina*, 958 N.W.2d at 316. Essentia's reading of "pollution condition" would make the Healthcare Amendatory Endorsement superfluous. The Endorsement provides a narrow form of coverage ("remediation costs") for harm caused by certain viruses in a specific location ("in a building or structure, or the ambient air within such building or structure"). Policy at 29. If a virus were a "pollution condition," those limits would go away. In addition to remediation costs, a policyholder could recover "business interruption loss," and not just for viruses "in a building or structure, or the ambient air within such building or structure," but also for viruses on or in the "land," "the atmosphere, surface water, or groundwater." Policy at 13, 29; *see Bd. of Regents of Univ. of Minn.*, 517 N.W.2d at 892–93 (discussing the difference between the terms "air" and "atmosphere" and concluding that the latter does not refer to "air within a building"). If the Policy's coverage for "pollution condition[s]" already provided all of these things, there would be no need for the narrower form of coverage outlined in the Healthcare Amendatory Endorsement.

Essentia argues that this interpretation would transform the Endorsement into an impermissible "hidden exclusion," relying on *Atwater Creamery Co. v. Western National Mutual Insurance Co.*, 366 N.W.2d 271 (Minn. 1985). Pl.'s Mem. in Opp'n at 22–23. In *Atwater*, the Minnesota Supreme Court confronted a burglary insurance policy that limited its definition of "burglary" by requiring "evidence of forcible entry." 366 N.W.2d at 274. The policyholder experienced a burglary that left "no visible marks of physical damage" at the point of entry and exit. *Id.* The court held that the policy covered the burglary at issue notwithstanding the evidence-of-forcible-entry requirement. *Id.* at 278–79. The

14

court reasoned that the policy's "technical definition of burglary" was, "in effect, an exclusion from coverage" that would "defeat the reasonable expectations of the purchaser of the policy." *Id.* In the years since *Atwater*, Minnesota courts have narrowed the reasonable-expectations doctrine to "exceptional cases where a policy provision is both a hidden major exclusion and unconscionable as a result of unequal bargaining power where the insured may have been misled." *St. Paul Fire & Marine Ins. Co. v. FDIC*, 968 F.2d 695, 702–03 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Carlson*, 749 N.W.2d at 48–49; *Bd. of Regents of Univ. of Minn.*, 517 N.W.2d at 891 & n.4.

Essentia provides no persuasive reason why the reasonable-expectations doctrine should require interpreting the term "pollution condition" to include viruses. The Healthcare Amendatory Endorsement does not unreasonably limit a definition the way the burglary policy in *Atwater* did; it merely provides context for understanding the plain meaning of "pollution condition." Courts must consider such things when interpreting a policy as a whole.[7] *See Nat'l Indem. Co. v. Ness*, 457 N.W.2d 755, 759 (Minn. Ct. App. 1990) ("Endorsements attached to an insurance contract are part of the contract and the endorsements and policy must be construed together."). Nor is there any reason to believe

---

[7]  In a similar vein, Essentia argues that all the Healthcare Amendatory Endorsement does is impose a $2,000,000 sublimit on recovery for "remediation costs" resulting from an "indoor environmental condition," so it cannot say anything about the scope of coverage for "business interruption loss" resulting from a "pollution condition." *See* Pl.'s Mem. in Opp'n at 24. To be sure, the Endorsement is not a formal limitation on the Policy's business-interruption coverage, but it still provides relevant context that informs the meaning of other terms in the Policy.

15

that Essentia was misled. On the contrary, the Complaint suggests that Essentia is a sophisticated business entity, and the Parties' decision to use the Healthcare Amendatory Endorsement to vary the Policy language that would otherwise have applied indicates that they considered and bargained for a specific, more limited form of virus coverage.

In its Complaint and briefing, Essentia also alleges that "ACE has previously acknowledged to courts and regulators that a virus constitutes a contaminant and/or pollutant." Pl.'s Mem. in Opp'n at 25; Compl. ¶ 52.[8] It points to several pieces of extrinsic evidence, including: (1) a statement in another case from this District, *Rembrandt Enterprises, Inc. v. Illinois Union Insurance Company*, 269 F. Supp. 3d 905, 908 (D. Minn. 2017), that an ACE subsidiary did not "dispute" that the avian flu virus was a "pollution condition" under a substantially similar policy;[9] (2) 2007 regulatory filings from Wisconsin stating that a virus could fit into the definition of "contaminant" in a then-current pollution exclusion; (3) "other ACE insurance policies involving similar risks" that expressly define the terms "pollutant" and "contaminant" to include viruses; (4) a proposed endorsement that would specifically exclude loss arising out of viruses; and (5) other "public

---

[8]   Some jurisdictions recognize a doctrine known as "regulatory estoppel," which restricts an insurer's ability to contradict representations previously made to regulatory bodies. 17 Steven Plitt et al., *Couch on Insurance* § 239:117 (Dec. 2020 Update) (describing this as "[a] fairly uncommon form of estoppel"). Essentia does not purport to raise a regulatory estoppel argument, nor does it cite any cases in which a court applying Minnesota law has endorsed the doctrine. *See Anderson v. Minn. Ins. Guar. Ass'n*, 534 N.W.2d 706, 708–10 (Minn. 1995) (appearing to reject a regulatory estoppel argument in the face of unambiguous policy language).

[9]   Although *Rembrandt* involved a similar insurance policy, it concerned different provisions of the policy and therefore is not instructive in this case.

representations." Compl. ¶¶ 53–59. These allegations have no bearing on ACE's motion. A court interpreting an insurance policy may only consider extrinsic evidence if the policy is ambiguous, *see Cont'l Cas. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 940 F. Supp. 2d 898, 925 n.37 (D. Minn. 2013), and extrinsic evidence may not be used to "create[] an ambiguity" where none otherwise exists, *Larson*, 2008 WL 2020489, at *3; *see also Bundul v. Travelers Indem. Co.*, 753 N.W.2d 761, 764 (Minn. Ct. App. 2008) ("The extent of an insurer's obligations to its insured is governed by the language of the contract to which the parties agreed so long as the policy does not omit legally required coverage or contravene applicable statutes."). Because the Policy in this case is unambiguous, there is no need to look to extrinsic evidence. Moreover, if the Policy were ambiguous, then it would likely be appropriate to deny the motion to dismiss without addressing any extrinsic evidence. *See Verto Med. Sols., L.L.C. v. Allied World Specialty Ins. Co.*, __ F.3d __, No. 19-3511, 2021 WL 1877802, at *1 (8th Cir. May 11, 2021) (reversing the grant of a motion to dismiss "because the policy [was] ambiguous"); *accord Cumulus Invs., LLC v. Hiscox, Inc.*, __ F. Supp. 3d __, No. 20-cv-1919, 2021 WL 638167, at *1 (D. Minn. Feb. 18, 2021).

Finally, Essentia asks that any dismissal be without prejudice so it can have the opportunity to file an Amended Complaint correcting any deficiencies. The dismissal will be with prejudice because the problem with Essentia's Complaint is a legal one, not a factual one. The Policy does not provide coverage for business interruption losses resulting from a virus, so it is implausible that Essentia could successfully replead its claims. *See Wintermute v. Kan. Bankers Sur. Co.*, 630 F.3d 1063, 1068 (8th Cir. 2011) (explaining that a court may deny leave to amend when any amendment would have been futile); *cf.*

*Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019) (stating that a dismissal should be without prejudice if a plaintiff's claims "might conceivably be repleaded with success"), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).[10]

---

[10] In the alternative, ACE argues that the case must be dismissed because Essentia's business interruption was caused, not by COVID-19, but by Governor Walz's executive order. Def.'s Reply Mem. at 14–15. This argument raises an interesting question because of the two layers of causation the Policy requires for business interruption losses. Under the insuring agreement, "loss" generally need only "result[] from" a "pollution condition." Policy at 5. Minnesota courts tend to understand words like "arising out of" and "resulting from" to mean, essentially, but-for causation. *See Travelers Prop. Cas. Co. of Am. v. Klick*, 867 F.3d 989, 991 (8th Cir. 2017); *Eng'g & Constr. Innovations, Inc. v. W. Nat'l Mut. Ins. Co.*, No. A12-1785, 2013 WL 2460400, at *6 (Minn. Ct. App. June 10, 2013). But when a policyholder seeks "business interruption loss," the "business interruption" must be "directly attributable" to a "pollution condition" or "indoor environmental condition." The word "direct[]" typically signals an intent to require proximate causation, as distinguished from but-for causation. *Lipshultz v. Gen. Ins. Co. of Am.*, 96 N.W.2d 880, 886 (Minn. 1959); *see* 7 Steven Plitt et al., *Couch on Insurance* § 101:51 (3d ed. Dec. 2020 Update). "A loss is 'direct and proximate' if the loss is '[t]he active, efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started and working actively from a new and independent source.'" *Grill v. North Star Mut. Ins. Co.*, No. A13-1012, 2014 WL 274089, at *3 (Minn. Ct. App. Jan. 27, 2014) (quoting *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 290 (Minn. 1959)). It seems doubtful at this point that Essentia has plausibly alleged that COVID-19 proximately caused its lost revenue. For example, the Complaint says that the suspension of Essentia's operations was "directly attributable to the coronavirus, COVID-19, *and* the Shut Down Order issued by governmental authorities," Compl. ¶ 30 (emphasis added), but no other allegations suggest that Essentia would have suspended elective procedures were it not forced to do so. *Cf. Seifert*, 495 F. Supp. 3d at 752. If the Complaint were dismissed for failure to plausibly allege causation, it might have made sense to allow Essentia to replead its claims. *See* Pl.'s Mem. in Opp'n at 29. Nonetheless, because Essentia's claims fail as a matter of law for other reasons, it is unnecessary to resolve the causation question.

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings in this case,

**IT IS ORDERED THAT**:

1. Defendant ACE American Insurance Company's Motion to Dismiss [ECF No. 14] is **GRANTED**;

2. Plaintiff Essentia Health's Complaint [ECF No. 1] is **DISMISSED WITH PREJUDICE**.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 25, 2021                s/ Eric C. Tostrud
                                   Eric C. Tostrud
                                   United States District Court